Slip Op. 07-117

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| MITTAL STEEL USA, INC. (formerly INTERNATIONAL STEEL GROUP, INC.), | : : : : | |
| Plaintiff, | : : | |
| v. | : : | |
| UNITED STATES, | : | Before: Richard K. Eaton, Judge |
| Defendant, | : : : | Consol. Court No. 05-00308 Public Version |
| and | : : | |
| UNION STEEL MANUFACTURING CO., LTD.; DONGBU STEEL CO., LTD.; POSCO; and HYUNDAI HYSCO CO., LTD., | : : : : : : | |
| Deft.-Ints. | : : | |

OPINION

[United States Department of Commerce's final results of the tenth administrative review of the antidumping duty order applicable to corrosion-resistant carbon steel flat products from Korea sustained.]

Dated: August 1, 2007

*Stewart and Stewart* (*Wesley K. Caine*, *Caryn B. Schenewerk* and *Sarah V. Stewart*), for plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *Jeanne E. Davidson*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Patricia M. McCarthy*, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*); Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Ada Loo* and *Irene H. Chen*), of counsel, for defendant.

*Troutman Sanders LLP* (*Donald B. Cameron* and *Brady W. Mills*), for defendant-intervenors Union Steel Manufacturing Co., Ltd. and

Consol. Court No. 05-00308                                    Page   2

Dongbu Steel Co., Ltd.

*Akin, Gump, Strauss, Hauer & Feld, LLP* (*Spencer S. Griffith*,
*Warren E. Connelly*, *Jaehong D. Park*, *Jarrod M. Goldfeder*, *Jason
A. Park* and *Lisa W. Ross*), for defendant-intervenors POSCO and
Hyundai HYSCO Co., Ltd.


     Eaton, Judge:  This consolidated action[1] is before the court

on plaintiff Mittal Steel USA, Inc.'s ("Mittal") motion for

judgment upon the agency record pursuant to USCIT Rule 56.2.  By

its motion, plaintiff contests certain aspects of the United

States Department of Commerce's ("Commerce" or the "Department")

final results of the tenth administrative review of the

antidumping duty order applicable to imports into the United

States of corrosion-resistant carbon steel flat products ("CORE")

from Korea made during the period of review ("POR") August 1,

2002, to July 31, 2003.  *See* Certain CORE from the Republic of

Korea, 70 Fed. Reg. 12,443 (Dep't of Commerce Mar. 14, 2005)

(tenth admin. rev.) ("Final Results").  In addition, plaintiff

contests portions of the Department's conclusions with respect to

Hyundai HYSCO Co., Ltd.'s ("HYSCO") new shipper review, which was

part of the same determination.  *See* 19 U.S.C. § 1675(a)(2)(B)

(2000).  Jurisdiction is had pursuant to 28 U.S.C. § 1581(c)

---

[1]     This action includes court numbers 05-00308 and 05-
00309.  *See Mittal Steel USA ISG, Inc. v. United States*, Consol.
Ct. No. 05-00308 (Oct. 5, 2005) (order granting plaintiff's
consent motion to consolidate cases).  Court number 05-00309
involved plaintiff's challenge to the final results of the new
shipper review.

Consol. Court No. 05-00308                              Page   3

(2000), and 19 U.S.C. § 1516a(a)(2)(B)(iii).  For the reasons set

forth below, Commerce's Final Results are sustained.


BACKGROUND

Plaintiff is a domestic producer of CORE products.  On

August 19, 1993, Commerce published the antidumping duty order

applicable to imports into the United States of CORE from Korea.

*See* Certain CORE From Korea, 58 Fed. Reg. 44,159 (Dep't of

Commerce Aug. 19, 1993) ("CORE Order").  After having conducted

nine prior administrative reviews of the CORE Order, Commerce, on

August 1, 2003, published notice that it would consider requests

for what would be the tenth review.  *See* Certain CORE from Korea,

68 Fed. Reg. 45,218 (Dep't of Commerce Aug. 1, 2003) (notice).

Thereafter, on August 29, 2003, plaintiff asked Commerce to

conduct an administrative review with respect to the behavior and

market activities of certain Korean respondents including: POSCO;

Dongbu Steel Co., Ltd. ("Dongbu"); and Union Steel Manufacturing

Co., Ltd. ("Union").  The tenth administrative review was

initiated on September 30, 2003.  *See* Initiation of Antidumping

and Countervailing Duty Reviews, 68 Fed. Reg. 56,262, 56,263–64

(Dep't of Commerce Sept. 30, 2003) (notice).  In addition, during

the proceeding, HYSCO sought a new shipper review of its sales of

CORE to the United States pursuant to 19 U.S.C. § 1675(a)(2)(B),

which Commerce initiated on October 3, 2003.  *See* Certain CORE

Consol. Court No. 05-00308                                  Page  4

from Korea, 68 Fed. Reg. 57,423 (Dep't of Commerce Oct. 3, 2003)

(notice).

On March 14, 2005, Commerce published the Final Results of

both the tenth administrative review and HYSCO's new shipper

review.  *See* Final Results, 70 Fed. Reg. at 12,443.  Based on its

analysis, Commerce assigned subject imports from POSCO a 2.34

percent dumping margin; Union and Dongbu received *de minimis*

margins;[2] and HYSCO, as a result of the new shipper review,

received a margin of zero.  *See id.* at 12,445.


STANDARD OF REVIEW

When reviewing a final antidumping determination the court

"shall hold unlawful any determination, finding, or conclusion

found . . . to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).  "Substantial evidence is 'such relevant

evidence as a reasonable mind might accept as adequate to support

a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United

States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol.*

---

[2]      Under the statute, Commerce is required to "disregard
any weighted average dumping margin that is de minimis as defined
in section 1673b(b)(3) of this title."  19 U.S.C. § 1673d(a)(4).
"[A] weighted average dumping margin is de minimis if the
administering authority determines that it is less than 2 percent
ad valorem or the equivalent specific rate for the subject
merchandise."  19 U.S.C. § 1673b(b)(3).  Thus, Union and Dongbu
were not required to pay antidumping duties on their entries.

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Id*. (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

In addition, "[a]s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology."  *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137, 1139 (Fed. Cir. 1987).


DISCUSSION

I. Model Match Methodology

Plaintiff's first claim is that the Department unreasonably denied its request that respondents be asked to provide more detailed product data for use in Commerce's model match criteria.[3]  The agency employs these criteria to ensure that the

---

[3]     The criteria include: type; reduction process; metallic coating process; clad material/coating metal; quality; yield strength; metallic coating weight; minimum thickness; width; form; temper rolling; and leveling.  Letter from Stewart and
(continued...)

merchandise sold in the U.S. market is being compared "with a

suitable home-market product" for purposes of calculating

antidumping duties.  *Koyo Seiko Co. v. United States*, 66 F.3d

1204, 1209 (Fed. Cir. 1995); *see also* 19 U.S.C.

§ 1677(16)(C)(iii).

     Commerce maintains that, in accordance with its practice, it

chose the model match criteria during the initial sales at less

than fair value investigation and has used them in each review

since in order to provide a "consistent methodology from review

to review" upon which respondents could rely.  Def.'s Resp. Pl.'s

Mot. J. Agency R. ("Def.'s Resp.") 9; *see also* Certain CORE From

Korea, 58 Fed. Reg. 37,176 (Dep't of Commerce July 9, 1993).

     It is plaintiff's position that, had respondents been asked

for more specific product data, it would have been able to

conduct a more detailed analysis and possibly uncover a

compelling reason for changing the criteria, thus enabling

Commerce to produce more accurate results.  *See* Pl.'s Mem. Supp.

Mot. J. Agency R. ("Pl.'s Mem.") 12 ("Commerce refused even to

request that respondents submit the more precise data.  This

precluded Mittal from analyzing detailed sales information that

might have substantiated Mittal's fair concerns . . . .")

_____

[3](...continued)
Stewart, Wesley K. Caine, to Commerce (May 28, 2004) Ex. A, at A-
2.

(emphasis omitted).[4]

For Commerce, the need for consistency in the model match criteria stems from its duty to calculate antidumping rates as accurately as possible.  *See, e.g.*, *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994).  Because consistency is, according to Commerce, linked inextricably to accuracy, the Department maintains that it changes its model match criteria only if a participant can demonstrate a

---

[4]      For instance, plaintiff states:

Commerce defined "widths" by reference to the following four measurement groups: (a) >= ½" but <24"; (b) >=24" but <40"; (c) >=40" but <60"; and (d) >=60".  Similarly, it defined "thickness" by reference to these 11 separate groups: (a) <0.014"; (b) >=0.014" but <0.015"; (c) >=0.015" but <0.016; (d) >=0.016" but <0.018"; (e) >=0.018" but <0.022"; (f) >=0.022" but <0.028"; (g) >=0.028" but <0.044"; (h) >=0.044" but <0.060"; (i) >=0.060" but <0.085"; (j) >=0.085" but <0.130"; and (k) >=0.130".  Thus, to identify goods for price comparisons, Commerce would treat as "identical" articles all CORE within a given range, so far as the particular criterion was concerned.  Put differently, articles with different physical dimensions could still be treated as "identical," and Commerce could directly compare their prices in antidumping margin calculations.

Pl.'s Mem. 6.  In Mittal's view, requiring respondents to provide product data on a narrower range of dimensions might have provided a compelling reason to change the criteria.  That is, more specific data could, according to plaintiff, have demonstrated a substantial difference between the subject merchandise and the purportedly comparable foreign like product.

"compelling reason" for the modification.  Def.'s Resp. 9; *see*

*also* Mem. from Eric B. Greynolds, Program Manager, Office of

AD/CVD Enforcement VI, to Melissa G. Skinner, Dir., Office of

AD/CVD Enforcement VI (Aug. 27, 2004) ("Model Match Mem.") at 5

(citing Steel Wire Rope From Malaysia, 66 Fed. Reg. 12,759 (Dep't

of Commerce Feb. 28, 2001); Antifriction Bearings (Other than

Tapered Roller Bearings) and Parts Thereof From France; et al.,

57 Fed. Reg. 28,360, 28,366 (Dep't of Commerce June 24, 1992);

Tapered Roller Bearings, Finished and Unfinished, and Parts

Thereof, From Japan, 56 Fed. Reg. 41,508, 41,509 (Dep't of

Commerce Aug. 21, 1991)).

Plaintiff first introduced its concerns in a letter from its

counsel to Commerce.  *See* Letter from Stewart and Stewart, Wesley

K. Caine, to Commerce (May 28, 2004) ("May 28 Letter").  By this

letter, plaintiff sought to demonstrate the necessity of

demanding more specific data by claiming that the product ranges

in Commerce's questionnaire, for thickness, width, type and

quality did not correspond with the actual data contained in

Union's, Dongbu's and POSCO's pricing sheets.  *See* May 28 Letter

at 2.  To bolster its position that Commerce should have asked

respondents for additional product and pricing information,

plaintiff compared merchandise within Commerce's ranges to the

prices charged.[5]  Mittal concluded that Commerce's ranges

produced a variance in prices sufficient to warrant the agency's

issuance of a supplemental questionnaire.  *See* Pl.'s Mem. 27

("This should have prompted the agency to at least request more

precise data, which would have allowed it and Mittal to pursue

the matching issues more deeply via computer analysis.  However,

the agency refused to request the information, much less perform

analyses, which left valid issues un-addressed.") (emphasis

omitted); *see also* Pl.'s Mem. 27 (citing *Freeport Minerals Co. v.

United States*, 776 F.2d 1029, 1033 (Fed. Cir. 1985)).  Before the

court, plaintiff continues to press this claim insisting,

---

[5]     Specifically, plaintiff [[

                                                   ]]  Pl.'s
Mem. 8.  For instance, with respect to thickness, plaintiff
contends that it examined

        [[







                                             ]]

Pl.'s Mem. 8 (emphasis omitted).  Plaintiff contends that it
found similar results after analyzing [[
        ]].  *See* Pl.'s Mem. 8-10.

however, that it is not "asking the Court at this point to rule
categorically that Commerce's methodology completely fails as a
matter of law."  Pl.'s Mem. 27 n.13.

According to Commerce, it found the issuance of a
supplemental questionnaire was not required because plaintiff's
May 28 Letter, and the various price analyses contained therein,
failed to establish its necessity.  As Commerce stated in its
Model Match Memorandum:

> Regarding the price lists cited by
> [plaintiff] in [its] submission, we find
> there is no evidence indicating that the
> price lists reflect actual transaction
> prices, and, thus, we find that they do not
> necessarily reflect the Korean respondents'
> actual sales and pricing practices.  In
> addition, several of the price lists cited by
> [plaintiff] are exclusive to the Korean
> respondents' home market and, thus, offer no
> information on how the products are sold in
> the U.S. market.  Therefore, we find that the
> internal pricing guidelines cited by
> [plaintiff]: (1) fail to indicate a change in
> the Korean respondents' production/pricing
> practices and (2) do not necessarily reflect
> the norms of the Korean respondents.

Model Match Mem. at 5-6.

Commerce further argues that plaintiff "overstates the case
that narrower bands for model matches will necessarily create
more accurate results."  Def.'s Resp. 14.  The Department insists
that "the more bands that are applied, the fewer actual sale to
sale matches there will be -- requiring Commerce to resort to
constructed value for additional United States sales."  Def.'s

Consol. Court No. 05-00308                              Page   11

Resp. 14.

As has been noted, plaintiff does not demand a change in the
Department's methodology.  Mittal's sole claim is that Commerce
should have sought more information from the respondents.  The
stated purpose of plaintiff's request is to uncover additional
information that it hopes will provide a basis for a challenge to
Commerce's model match criteria.  Therefore, the court is asked
to determine whether Commerce supported with substantial evidence
its decision not to issue a supplemental questionnaire seeking
additional model match data.  The court finds that Commerce has
justified its decision.

First, as noted by Commerce, the price lists plaintiff
references are just what they appear to be — price lists.  This
being the case, Commerce was justified in finding that they did
not necessarily reflect actual sales.  Commerce, on the other
hand, had obtained actual sales data from the questionnaire
responses upon which it reasonably relied.  Also, Commerce
observed that some of plaintiff's evidence of respondents'
pricing practices related solely to home market sales, which shed
no light on the price of CORE sold by respondents in the United
States.  Moreover, Commerce was not unreasonable in finding that
plaintiff's demand to narrow the range of dimensions compared
would create more inaccuracies in dumping calculations because
fewer actual sales would be available for direct comparison.

Consol. Court No. 05-00308                           Page  12

Thus, because plaintiff has not made out a sufficient case
for the issuance of a supplemental questionnaire and because the
Department had in its possession all of the information needed to
make a fair and reasonable product comparison, the court sustains
Commerce's decision not to seek additional product and sales
data.


II.  Constructed Export Price: Deduction of Selling Expenses

A.   Location of Incurred Costs

Plaintiff next insists that Commerce unlawfully failed to
deduct from constructed export price ("CEP")[6] certain "core

---

[6]      Constructed export price ("CEP") is

the price at which the subject merchandise is
first sold (or agreed to be sold) in the
United States before or after the date of
importation by or for the account of the
producer or exporter of such merchandise or
by a seller affiliated with the producer or
exporter, to a purchaser not affiliated with
the producer or exporter, as adjusted under
subsections (c) and (d) of this section.

19 U.S.C. § 1677a(b).  CEP, or U.S. price, is then compared to
normal value to calculate the dumping margin.  Normal value is
defined as

the price at which the foreign like product
is first sold (or, in the absence of a sale,
offered for sale) for consumption in the
exporting country, in the usual commercial
quantities and in the ordinary course of
trade and, to the extent practicable, at the
same level of trade as the export or
constructed export price . . . .

(continued...)

selling expenses[7] associated with resale transactions of subject

merchandise in the United States . . . merely because [the

expenses] involved activities that occurred 'outside' the United

States." Pl.'s Mem. 33.  More specifically, plaintiff asserts

that Commerce committed legal error by its unwillingness to make

a downward adjustment to CEP equal to the claimed selling

expenses incurred by the Korean parents in facilitating the

resales of CORE to unaffiliated U.S. customers.[8]  See Pl.'s Mem.

12-13.  For plaintiff, under 19 U.S.C. § 1677a(d),[9] if "the

_____

        [6](...continued)
19 U.S.C. § 1677b(a)(1)(B)(i).

        [7]    Plaintiff's reference to "core" selling functions is
apparently intended to describe such activities as negotiating
price, entering into sales contracts and approving resales;
however, neither the statute nor the regulations define the
phrase.  See Pl.'s Mem. 39 (suggesting that Commerce define
"core" functions, if necessary).

        [8]    The Korean parent companies are respondents: Union,
Dongbu, POSCO and HYSCO.

        [9]    Subsection 1677a(d) provides, in pertinent part:

        [T]he price used to establish [CEP] shall
        also be reduced by——

                (1) the amount of any of the
                following expenses generally
                incurred by or for the account of
                the producer or exporter, or the
                affiliated seller in the United
                States, in selling the subject
                merchandise (or subject merchandise
                to which value has been added)——

                        (A) commissions for

                                                        (continued...)

activities and associated expenses relate to the resales in the

United States," the deduction must be made regardless of when and

where the expenses were incurred.  Pl.'s Mem. 12.

   With respect to plaintiff's legal contention, Commerce does

not disagree.  That is, the Department maintains that it makes

justified CEP deductions no matter where expenses are incurred or

paid.  *See* Def.'s Resp. 16 (noting that Commerce deducts from CEP

selling expenses that "relate directly to the sale to an

unaffiliated purchaser, even if, for example, the foreign parent

of the affiliated U.S. importer pays those expenses") (internal

quotation marks & citation omitted).  Rather, Commerce urges that

its decision here not to deduct certain costs from CEP was

_____

[9](...continued)

                        selling the subject
merchandise in the United
States;

                        (B) expenses that result
from, and bear a direct
relationship to, the
sale, such as credit
expenses, guarantees and
warranties;

                        (C) any selling expenses
that the seller pays on
behalf of the purchaser;
and

                        (D) any selling expenses
not deducted under
subparagraph (A), (B), or
(C) . . . .

19 U.S.C. § 1677a(d)(1).

appropriate because the amounts expended by respondents related
to sales to affiliated U.S. importers and not to unaffiliated
U.S. customers.  *See* Def.'s Resp. 14; *see also* 19 C.F.R.
§ 351.402(b) (2005);[10] Issues & Decisions for the Final Results
of the Antidumping Duty New Shipper Review and the Antidumping
Duty Administrative Review of Certain CORE from Korea (Dep't of
Commerce Mar. 7, 2005) ("Issues & Decs. Mem.") at 10.

Moreover, at no point does Commerce state that it did not
deduct the expenses because they were incurred in Korea.  Rather,
it is apparent that Commerce's justification for its decision to
not deduct from respondents' CEP certain expenses is its
conclusion that selling expenses can only be deducted from CEP
when they are incurred in connection with the sale of merchandise
to an unaffiliated U.S. customer.  Thus, plaintiff's legal
argument that Commerce acted unlawfully by refusing to deduct

---

[10]     The regulation provides:

> In establishing [CEP] under section 772(d) of
> the Act, the Secretary will make adjustments
> for expenses associated with commercial
> activities in the United States that relate
> to the sale to an unaffiliated purchaser, no
> matter where or when paid.  The Secretary
> will not make an adjustment for any expense
> that is related solely to the sale to an
> affiliated importer in the United States,
> although the Secretary may make an adjustment
> to normal value for such expenses under
> section 773(a)(6)(C)(iii) of the Act.

19 C.F.R. § 351.402(b).

from CEP selling expenses incurred by respondents simply because

those expenses were from activities taking place outside the

United States is without merit.

     B.    Costs Related to Resales of CORE to Unaffiliated U.S.
           Purchasers

     Plaintiff also raises the factual argument that respondents

did, in fact, incur core selling expenses "associated with

commercial activities in the United States that relate to the

sale to an unaffiliated purchaser . . . ."  19 C.F.R.

§ 351.402(b).  Commerce's failure to deduct those expenses from

CEP was, in Mittal's view, unsupported by substantial evidence.

     To buttress its point, plaintiff sets forth what it believes

were the selling functions performed by each respondent in the

resale of its merchandise in the United States.  For instance,

with respect to Union's relationship with its affiliate DKA,

plaintiff states:

> Union sold CORE to DKA, its U.S. affiliate,
> who in turn resold the merchandise to
> unrelated U.S. buyers in reportable CEP
> transactions.  The record shows that Union,
> the parent, performed many selling functions
> in the affiliate's U.S. *re-sales*.  In fact,
> describing the affiliate's limited role,
> Union reported that DKA was the importer of
> record for all of Union's U.S. sales and
> acted as a communications liaison between
> U.S. customers and Union and as a processor
> of sales-related documentation.  Thus, while
> DKA receives inquiries from customers and may
> propose a price for the purchase, it does not
> have the authority to accept or reject the
> order.  In fact, DKA does not even take
> possession of the imported goods; rather,

> Union ships the goods directly to DKA's U.S.
> customer.

Pl.'s Mem. 13 (internal quotation marks & citations omitted)
(emphasis in original).  In addition, plaintiff states that Union
engaged in other activities aimed at selling CORE to unrelated
U.S. customers including handling claims for defective CORE sold
in the U.S. and sending company engineers directly to a
customer's plant in order to assist that customer with
streamlining its facility.  *See* Pl.'s Mem. 13.[11]  Thus, it is
plaintiff's contention that the costs absorbed by Union in the
resale of CORE to an unaffiliated U.S. customer should have been
deducted from CEP.

Plaintiff makes similar claims with regard to POSCO, Dongbu
and HYSCO.  Based on its construction of the facts, plaintiff
maintains that the record reveals a substantial level of
involvement by the respondents in the resale of CORE to
unaffiliated U.S. purchasers.  That is, Mittal insists that the
respondents incurred selling expenses related to the resale of
CORE to unaffiliated buyers in the United States and, thus, in
accordance with 19 U.S.C. § 1677a(d)(1) and 19 C.F.R.
§ 351.402(b), Commerce is required to deduct the costs from CEP.
*See* Pl.'s Mem. 33, 37–38.

---

[11]     Moreover, plaintiff suggests that Union [[

]]  Pl.'s Mem. 13.

Despite plaintiff's contentions, the court finds that Commerce supported with substantial evidence its decision to refrain from deducting the selling expenses identified by plaintiff as being associated with the resale of CORE to unaffiliated purchasers in the United States.  Commerce must deduct from the starting price only those expenses that are "associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser . . . ."  19 C.F.R. § 351.402(b).  Commerce, however, "will not make an adjustment [to CEP] for any expense that is related solely to the sale to an affiliated importer in the United States . . . ."  *Id.*

Here, "Commerce requested and received from respondents information regarding all business or operational relationships affecting the development, product, sale or distribution of the subject merchandise," verified that information, and found that respondents' expenses did not relate to sales to unaffiliated U.S. buyers.  Def.'s Resp. 16.  For example, verification of Dongbu's questionnaire responses revealed:

> [S]ales negotiations begin with Dongbu USA
> [Dongbu's United States affiliate] and the
> U.S. customer.  Dongbu USA informs Dongbu of
> the sales order, then Dongbu inputs the sales
> order into Dongbu's sales system, at which
> time the merchandise is produced to order.
> Company officials stated that Dongbu ships
> directly to the port of the customer's
> request, which is stated in the sales
> contract between Dongbu USA and customer.
> Company officials added that the shipment
> arrangements are made by Dongbu according to

>           the terms that are negotiated between the
>           customer and Dongbu USA. . . .  Company
>           officials also stated that Dongbu USA clears
>           the merchandise through Customs and arranges
>           for the payments of the customs broker and
>           customs duties. . . .  Company officials
>           stated that Dongbu USA generally issues the
>           invoice to the customer after it has been
>           shipped, but before it arrives to the United
>           States. . . .  They stated that the customer
>           pays Dongbu USA . . . .

Dongbu Verification Mem. (Dep't of Commerce Feb. 1, 2005) at 29;

*see also id.* at 30 ("We reviewed the list of selling activities

performed by Dongbu and Dongbu USA for each market, and

distribution channel.  We also reviewed the list of selling

activities and confirmed with company officials the level of

activity in each market . . . .  We noted no discrepancies.").

The Department understood this evidence to indicate that Dongbu's

U.S. affiliate, not Dongbu, incurred the selling expenses

resulting from U.S. resales of CORE.  Because "[t]here is no

evidence on the record to suggest [Dongbu's] reported . . .

selling expenses are directly attributable to U.S. sales,"

Commerce concluded that these expenses were not deductible from

CEP.  Issues & Decs. Mem. at 10.

     Commerce made similar findings with respect to the level of

involvement in resales of CORE to unaffiliated U.S. purchasers

upon verifying Union's, POSCO's and HYSCO's responses and

likewise found the reported incurred expenses to be unrelated to

those sales.  *See* Union Verification Mem. (Dep't of Commerce Feb.

1, 2005) at 20; Sales Verification Rep. for POSCO (Dep't of
Commerce Feb. 1, 2005) at 26; Verification of Sales and Cost
Information Submitted by HYSCO (Dep't of Commerce Feb. 1, 2005)
at 9.

    As discussed above, plaintiff interprets the record evidence
to indicate a higher level of involvement by the respondents in
the resale of CORE than that found by the Department.  Commerce,
however, considered the verification data and determined that
there was "no evidence on the record to suggest respondents'
reported . . . selling expenses [were] directly attributable to
U.S. sales."  Issues & Decs. Mem. at 10.  In fact, after
verifying respondents' questionnaire responses, the Department
found that the expenses respondents incurred in selling CORE to
their affiliates in the United States were general and not
related to resales of CORE to unaffiliated buyers.  *See id.*

    An examination of Commerce's analysis and of the evidence
submitted by plaintiff confirms that Commerce was justified in
its findings.  That is, plaintiff has not made a case that the
selling functions performed by the parent companies were
mischaracterized by Commerce.  In addition, Commerce has
adequately explained its conclusions.  Thus, despite plaintiff's
claim to the contrary, the court finds that the Department
"articulate[d] a[] rational connection between the facts found
and the choice made."  *Burlington Truck Lines, Inc. v. United*

*States*, 371 U.S. 156, 168 (1962).

     Based on the foregoing, the court sustains as supported by substantial evidence Commerce's refusal to deduct selling expenses from CEP because the Department reasonably concluded that respondents' reported expenses were not directly associated with resales of CORE to unaffiliated purchasers in the United States.

## III. Dongbu and POSCO CEP Offset Adjustments

     Next, plaintiff takes issue with Commerce's grant of a CEP offset to normal value to both POSCO and Dongbu to adjust for their home-market sales having been made at a more advanced stage of distribution than their sales in the United States.[12]  *See* 19 U.S.C. § 1677b(a)(7)(B).  Specifically, plaintiff asserts that "Commerce acted unreasonably when it allowed the . . . 'CEP offsets' to respondents who failed to provide full descriptions of all selling activities at the CEP [level of trade]."  Pl.'s Mem. 24.  For these purposes, CEP sales involve the resale of

---

     [12]   The Federal Circuit has stated that "the level of trade adjustment is designed to ensure that the normal value and U.S. price are being compared . . . at the same level of trade, that is, at the same marketing stage in the chain of distribution that begins with the manufacturer." *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1314 (Fed. Cir. 2001).  Indeed, an adjustment to normal value is necessary because "[e]ach more remote level of trade must be characterized by an additional layer of selling activities, amounting in the aggregate to a substantially different selling function."  *Id.* (internal quotation marks, alteration & citation omitted).

goods from the U.S. affiliate to an unaffiliated U.S. buyer.

Because it is often the case that the U.S. affiliate will absorb

the majority of the selling expenses and perform most, if not all

of the selling functions in the resale to an unaffiliated buyer,

Commerce looks to the "sale *to* the affiliate, not the affiliate's

resale transaction" for purposes of determining the CEP level of

trade ("LOT").  Pl.'s Mem. 18 (emphasis in original); *see also*

Certain Hot-Rolled Carbon Steel Flat Products from Romania, 70

Fed. Reg. 72,984, 72,987 (Dep't of Commerce Dec. 8, 2005)

(prelim. results) (stating that "[f]or CEP sales, the U.S. level

of trade is the level of the constructed sale from the exporter

to the affiliated importer").[13]  Because neither Dongbu nor POSCO

---

[13]     While CEP is statutorily defined as "the price at which
the subject merchandise is first sold . . . in the United States
before or after the date of importation by . . . a seller
affiliated with the producer or exporter, to a purchaser not
affiliated with the producer or exporter," 19 U.S.C. § 1677a(b),
for purposes of comparing the level of trade for CEP sales,
Commerce examines the selling functions performed by the foreign
producer or exporter in selling the merchandise to its U.S.
affiliate.  *See* Preamble to Final Rule, 62 Fed. Reg. 27,296,
27,370 (Dep't of Commerce May 19, 1997) ("[T]he Department will
base the LOT of CEP on the U.S. affiliate's starting price in the
United States . . . .").
        In an unrelated investigation, Commerce explained its
procedure for determining the CEP LOT:

        First, the indirect selling expenses incurred
        in the United States by [U.S. affiliate]
        CIC's sales departments are, pursuant to [19
        U.S.C. § 1677a(d)(1)(D)], properly excluded
        from the price calculated for the U.S. CEP
        sales.  Pursuant to this and other . . .
        adjustments, [the U.S. affiliate]'s price to
                                            (continued...)

reported any selling expenses incurred for sales to their U.S. affiliates, plaintiff insists that the record does not support Commerce's grant of a CEP offset.

Commerce is required by statute to make an LOT adjustment to normal value to account for the price differential resulting from a respondent's sales in the home market being made at a more advanced LOT than its sales to the United States.[14]  *See* 19 U.S.C. § 1677b(a)(7)(A).  The statute further provides that the Department only makes an LOT adjustment to normal value if "the difference in [LOT] . . . is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different [LOTs] in the country in which normal value is determined."  19 U.S.C. § 1677b(a)(7)(A)(ii).

---

[13](...continued)
     its unaffiliated customer (the "starting price") is transformed into a constructed export price, i.e., a constructed equivalent of a market-based sale by [foreign producers/exporters] Cinsa or ENASA to CIC [the U.S. affiliate].  This is the point at which the level of trade comparison is made.

Porcelain-on-Steel Cookware From Mexico, 63 Fed. Reg. 38,373, 38,378 (Dep't of Commerce July 16, 1998) (final results).

[14]    The Federal Circuit has noted that "[n]either the statute nor the accompanying Statement of Administrative Action . . . defines the phrase 'same level of trade.'"  *Micron Tech.*, 243 F.3d at 1305 (citation omitted).  Nonetheless, the Court has interpreted the term "to mean comparable marketing stages in the home and United States markets, e.g., a comparison of wholesale sales in Korea to wholesale sales in the United States."  *Id.*

Where the record contains insufficient data to make an LOT

adjustment, a CEP offset to normal value may be granted.[15]

> When normal value is established at a[n]
> [LOT] which constitutes a more advanced stage
> of distribution than the [LOT] of the [CEP],
> but the data available do not provide an
> appropriate basis to determine under
> subparagraph (A)(ii) a[n] [LOT] adjustment,
> normal value shall be reduced by the amount
> of indirect selling expenses incurred in the
> country in which normal value is determined
> on sales of the foreign like product . . . .

19 U.S.C. § 1677b(a)(7)(B).  Unlike an LOT adjustment, then, the

CEP offset does not demand evidence of an effect on price

comparability.  Indeed, the CEP offset can only be used in the

absence of such evidence.  *See* 19 C.F.R. § 351.412(f)(3) ("Where

available data permit the Secretary to determine under paragraph

(d) of this section whether the difference in [LOT] affects price

---

[15]     Congress anticipated the situation where the record
would support a finding that sales were made at different levels
of trade but would fall short of establishing that the difference
had a measurable effect on price comparability and thus created
the CEP offset adjustment.  *See* Statement of Administrative
Action, Uruguay Round Agreements Act, accompanying H.R. Rep. No.
103-316, 656, 830-31 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040,
4169 ("SAA").

> The constructed export price offset
> adjustment will only be made where normal
> value is established at a level of trade more
> remote from the factory than the level of
> trade of the constructed export price; i.e.,
> where the [LOT] adjustment . . . if it could
> have been quantified, would likely have
> resulted in a reduction of the normal value.

*Id.* at 831, 1994 U.S.C.C.A.N. at 4169.

comparability, the Secretary will not grant a [CEP] offset.   In

such cases, . . . the Secretary will make a[n] [LOT]

adjustment.").

   Finding sales to be at a more advanced stage of distribution

can be shown by evidence that the foreign producer or exporter

performs more selling activities, and thus incurs more selling

expenses, in its home market than it does in the United States.

*See Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1305

(Fed. Cir. 2001) ("The effect [of the CEP offset] is to reduce

the price of the more advanced level of trade by 'indirect

selling expenses' that have been included in the price on the

apparent theory that such costs would not have been incurred if

the sale had been made on a less advanced [LOT].").

   Here, Commerce allowed both Dongbu and POSCO a CEP offset.

In reaching its decision to grant the offset, Commerce examined

the data submitted by each respondent for its home-market and

United States sales.

   After comparing Dongbu's selling functions in the home

market to its selling functions in the United States, the

Department "found a less advanced level of trade in the U.S.

market."  Calculation Mem. for Dongbu (Dep't of Commerce Aug. 30,

2004) ("Dongbu Offset Mem.") at 2.  For that reason, Commerce

found warranted the grant of a CEP offset in order to "match[]

the U.S. CEP sales to sales at the same level of trade in the

Consol. Court No. 05-00308                                    Page  26

home market." *Id.*

        The Department also reviewed POSCO's reported home-market

selling activities and

> granted a CEP offset because we found that
> the home market sales[16] were at a different
> stage of distribution compared to sales to
> the U.S. [stage of distribution] with respect
> to the [home market] [stage of distribution].
> Because the [stage of distribution] of the
> U.S. sales is different than the home market
> [stage of distribution] and there is no home
> market [stage of distribution] comparable to
> that of the CEP sales, there is no reliable
> basis for quantifying a[n] LOT adjustment
> . . . .  Therefore, a CEP offset was applied
> to [normal value] for the [normal value]-CEP
> comparisons.

*Id.* at 10.

        Plaintiff's principal claim is that Commerce lacked evidence

sufficient to justify a CEP offset.  *See* Pl.'s Mem. 39-40.

Mittal argues that "[i]n its initial questionnaire Commerce

instructed all respondents to identify all selling activities

relevant to claims for any LOT adjustments, *ergo* CEP

offsets. . . .  Both POSCO and Dongbu responded to Commerce's

questionnaire.  They did not, however, provide information

regarding selling activities in sales at the CEP LOT."  Pl.'s

Mem. 40.  In other words, plaintiff maintains that the absence of

information regarding respondents' selling expenses incurred in

---

[16]     Commerce calculated net home market price using a
formula set forth in the POSCO Offset Memorandum.  The formula
appears to have taken into account various expenses including
packing, credit and rebates.  POSCO Offset Mem. at 5-6.

making CORE sales to their U.S. affiliates should have prompted

Commerce to ask respondents for that data before granting the

respondents a CEP offset.

    Plaintiff further argues that this absence of information

does not mean that there were no such expenses and that the

inclusion of these expenses would likely indicate that the home-

market LOT was not more advanced than that at the CEP level.  *See*

Pl.'s Mem. 43.  For plaintiff,

> both POSCO and Dongbu actively assist their
> U.S. affiliates in reselling merchandise in
> the United States.  Since those resales are
> *affiliates'* sales, it is fair to conclude
> that the Korean parents perform the
> activities to promote *their own* sales to the
> affiliates at the CEP LOT.  Therefore,
> Commerce should have weighed the activities
> in the analysis of offset claims.

Pl.'s Mem. 42 (emphasis in original); *see also* Pl.'s Mem. 42-43.

    Despite plaintiff's arguments, the court finds Commerce's

grant of a CEP offset to POSCO and Dongbu supported by

substantial evidence and in accordance with law.  In particular,

the court concludes that the Department, while not having

sufficient evidence to make an LOT adjustment, reasonably relied

on evidence of the selling functions performed by POSCO's and

Dongbu's U.S. affiliates in deciding to grant the companies a CEP

offset.

    In making its determination, the Department "review[ed] the

distribution system in each market (i.e., the 'chain of

distribution') [for both Dongbu and POSCO] including selling
functions, class of customer ("customer category") and level of
selling expenses for each type of sale."  Issues & Decs. Mem. at
11.

    With respect to Dongbu, Commerce's analysis of that
company's verified questionnaire responses revealed that in its
home market, "Dongbu sold [CORE] through two channels of
distribution to two customer categories, and claimed one level of
trade in the home market."  Dongbu Offset Mem. at 2.  Commerce
determined that, although Dongbu reported selling CORE in Korea
through two channels of distribution, "the two home market
channels of distribution . . . constitute one of level of trade."
*Id.*  Plaintiff does not dispute this finding.

    Commerce also analyzed Dongbu's sales to the United States
for purposes of determining whether an offset was necessary.  Of
importance here are two findings.  First, as plaintiff
acknowledges, Dongbu completed Commerce's questionnaire asking
that it "list . . . all the selling and activities performed and
services offered in the U.S. market and the foreign market."
Pl.'s Mem. 40.  Plaintiff claims that Dongbu's answers were
deficient even though Commerce verified the answers.  *See* Pl.'s
Mem. 40; Def.'s Resp. 21.  That is, plaintiff insists that Dongbu
must have had more selling expenses with respect to its sales at
the CEP LOT, i.e., sales to its U.S. affiliate, Dongbu USA, than

it reported.  Commerce, though, in verifying Dongbu's responses,
found only that "Dongbu's activities for U.S. sales are limited
to foreign movement expenses."  Dongbu & Union Br. Opp'n Pl.'s R.
56.2 Mot. J. Agency R. 40 (quoting Dongbu's Section A Resp. at
18).  Thus, while plaintiff may insist that there were other
unlisted expenses, the verified evidence on the record indicates
otherwise.

Commerce further found that "Dongbu made only CEP sales
through its U.S. affiliate, Dongbu USA, to unaffiliated customers
in two customer categories, end-users and distributors, and had
only one level of trade for U.S. sales."  Dongbu Offset Mem. at
2.  Noting that Dongbu USA "perform[ed] most of the selling
functions in the United States," Commerce concluded that Dongbu's
sales in the United States were at a less advanced stage of
distribution than its sales in its home market of Korea, and
granted Dongbu the CEP offset.  *See id.*

After performing the same analysis for POSCO, Commerce found
that the company sold CORE in Korea to three different types of
customer categories through three channels of distribution.  *See*
POSCO Offset Mem. at 9.  Commerce concluded that because the
selling activities undertaken in each of the three channels of
distribution "differed only slightly, . . . the home market
channels of distribution constituted one level of trade."  *Id.* at
10.

Commerce also "examined the sales to [POSCO's] affiliated resellers and examined the selling functions performed by POSCO . . . on behalf of its affiliate and found only one level of trade." *Id.* The Department found that, "[i]n the U.S. market, [POSCO] made only CEP sales of subject merchandise," through only one channel of distribution. *Id.* Further, sales were made by POSCO's affiliate to unaffiliated U.S. trading companies. *Id.* Plaintiff does not dispute these findings.

POSCO, too, submitted timely and complete responses to Commerce's questionnaire and the Department subsequently verified the answers. *See* POSCO & HYSCO Opp'n Pl.'s R. 56.2 Mot. J. Agency R. ("POSCO & HYSCO Br.") 28. POSCO's questionnaire responses showed that the company performed a substantial number of selling activities when selling CORE in Korea, but did not perform these activities when selling CORE in the United States. *See* POSCO & HYSCO Br. 28 (listing home-market selling activities including, but not limited to "sales and marketing; freight and delivery arrangement; market research; quality control; computer, legal, and accounting assistance and business-systems development assistance; . . . [and] sales force development and end user contact and support"). Based on this verified information, Commerce found that "the home market sales were at a different stage of distribution compared to sales to the U.S. LOT." POSCO Offset Mem. at 10.

     As has been noted by defendant, plaintiff's objections do
not amount to much more than speculation.  Indeed, plaintiff's
contention that Commerce unreasonably granted a CEP offset
because "a reasonable mind would recognize, as a matter of common
commercial sense, that affiliates engage in numerous inter-
company activities when performing complementary and overlapping
roles in marketing goods internationally," finds no evidentiary
support.  Pl.'s Mem. 42–43.  Commerce issued Dongbu and POSCO
questionnaires, the respondents provided timely and complete
answers, the Department then verified those responses and found
no discrepancies.  As a result, Commerce determined that the
hypothetical costs Mittal insisted had to exist simply did not.

     Further, plaintiff's related claim that Commerce lacked
sufficient evidence to grant the CEP offset because of Dongbu's
and POSCO's incomplete submissions is directly contradicted by
Commerce's verification of the companies' questionnaire
responses, which revealed no inconsistencies and which provided
sufficient evidence with respect to selling activities in both
the home and U.S. markets.  The court cannot, therefore, credit
plaintiff's unsubstantiated assertion that commercial realities
render insufficient the evidence Commerce relied upon in making
its decision to grant Dongbu and POSCO a CEP offset.

     Thus, the court sustains as supported by substantial
evidence and in accordance with law the Department's grant of a

CEP offset to both POSCO and Dongbu.


IV.  Duty Drawback Adjustment

     Plaintiff further contends that Commerce should not have

allowed for a duty drawback adjustment to CEP because it claims

the Korean drawback system is susceptible to manipulation.[17]  As

part of this claim, plaintiff maintains that Commerce's current

standard for making drawback adjustments amplifies the potential

for distorted dumping margins on Korean products, in part,

because a Korean exporter is not required to allocate its total

rebates over all of its shipments.  Mittal's specific complaint

is that the Department acted unlawfully by refusing to ask

respondents for further data thus "allowing for fair and

appropriate allocations" of the rebate received to the total lot

of respondents' shipments of CORE.  Pl.'s Mem. 45 (emphasis

omitted).

     The antidumping statute provides that "[t]he price used to

establish . . . [CEP] shall be . . . increased by . . . the

_____

     [17]  Generally, a "drawback" is "[a] government allowance or
refund on import duties when the importer reexports imported
products rather than selling them domestically."  Black's Law
Dictionary 532 (8th ed. 2004); *see also E.I. du Pont Nemours &
Co. v. United States*, 24 CIT 1045, 1046 n.2, 116 F. Supp. 2d
1343, 1345 n.2 (2000) ("[D]uty drawback" generally, is the refund
of duties paid on goods imported into the United States when
those goods, or domestic goods of the same kind and quality, are
used in the manufacture or production of articles which are
subsequently exported.").

amount of any import duties imposed by the country of exportation
which have been rebated, or which have not been collected, by
reason of the exportation of the subject merchandise to the
United States . . . ."  19 U.S.C. § 1677a(c)(1)(B).  Based on the
statute, Commerce has created a two-prong test that must be
satisfied prior to the grant of a drawback adjustment.  The first
prong requires the exporter to establish that "the import duty
and rebate are directly linked to, and dependent upon, one
another."  *Far East Mach. Co. v. United States*, 12 CIT 972, 974,
699 F. Supp. 309, 311 (1988) (internal quotation marks & citation
omitted).  The second prong demands that "the company claiming
the adjustment [must] demonstrate that there were sufficient
imports of imported raw materials to account for the duty
drawback received on the exports of the manufactured product."
*Id.*, 699 F. Supp. at 311; *see also* Issues & Decs. Mem. at 13.
For over twenty years, Commerce has consistently applied, and
this Court has consistently upheld, this test.  *See, e.g.*,
*Carlisle Tire & Rubber Co. v. United States*, 11 CIT 168, 171, 657
F. Supp. 1287, 1290 (1987); *Far East Mach. Co. v. United States*,
12 CIT 428, 431-33, 688 F. Supp. 610, 612 (1988) (citation
omitted); *Hornos Electricos de Venezuela, S.A. v. United States*,
27 CIT 1522, 1525, 285 F. Supp. 2d 1353, 1358 (2003); *Wheatland
Tube Co. v. United States*, 30 CIT __, __, 414 F. Supp. 2d 1271,
1286-87 (2006).

Here, following verification, Commerce found that the respondents had satisfied the two-prong test.  *See* Issues & Decs. Mem. at 13.  Mittal does not fault this finding.  Rather, plaintiff questions the utility of the test as applied to exports from Korea.  According to plaintiff, "Korea's duty drawback law effectively allows exporters to choose the export shipments on which they base drawback claims on exportations," which in turn permits an exporter to manipulate its dumping margin.  Pl.'s Mem. 24.  That is, for plaintiff, if an exporter is allowed to apply its drawback claims solely to shipments intended for the United States, CEP increases artificially and the dumping margin decreases.  Plaintiff insists that this potential for distorted results should have induced the Department to ask respondents for additional specific information relating to their drawback claims, which, in turn, Commerce could have used "to determine whether drawback claims were in fact disproportionate and excessive."  Pl.'s Mem. 46.

In essence, Mittal seeks the addition of a third prong to Commerce's current two-prong test.  That is, Mittal believes that the opportunity for margin manipulation would diminish if an exporter were required to demonstrate that it had allocated its rebates across all of its shipments. Plaintiff observes that, as in the United States, the Korean drawback scheme does not require such an allocation and thus opens the door for inaccurate dumping

Consol. Court No. 05-00308                                    Page  35

calculations.  In Mittal's view:

> Although unquestionably lawful in Korea, the
> Korean system makes it possible to manipulate
> U.S. antidumping results. . . .  We can
> assume that Korean "Producer X" produces only
> one product, CORE, and that it uses steel
> scrap as the basic input.  We can further
> assume that "X" imports 50 percent of its
> scrap consumption (paying import duties on
> the same) and obtains the balance locally.
> We can finally assume that "X" sells 50
> percent of its total production for export to
> the United States and 50 percent to Canada.
> Under these imagined circumstances, in
> conjunction with the Korean law, "X" could
> limit its claims for drawback solely to
> shipments to the United States while claiming
> nothing on shipments to Canada – with U.S.
> antidumping motivations in mind.

Pl.'s Mem. 44-45.  Thus, plaintiff insists that a required

shipment-wide allocation of drawback would eliminate the

distortion of dumping margins and maintain the integrity of the

antidumping statute.

    The court finds that Commerce's two-prong test is a

reasonable interpretation of 19 U.S.C. § 1677a(c)(1)(B) and that

it properly applied the test to the Korean respondents in this

case.  As noted, pursuant to 19 U.S.C. § 1677a(c)(1)(B), there

are two requirements for adjusting upward CEP based on rebated

import duties.  First, there must be "import duties imposed by

the country of exportation . . . ."  19 U.S.C. § 1677a(c)(1)(B).

Second, those duties must either be rebated or not collected by

the exporting country "by reason of the exportation of the

subject merchandise to the United States."  *Id.*  As this Court

has held previously, nothing in the statute requires an exporter

to demonstrate that it allocated its rebated or non-collected

duties across the totality of its subject shipments.  *See Far*

*East Mach. Co.*, 12 CIT at 979, 699 F. Supp. at 315 (finding that

Commerce's "approach is not an unfair way of proceeding," and

that the "method seems reasonably calculated to arrive at a

proper adjustment to price"); *Avesta Sheffield, Inc. v. United*

*States*, 17 CIT 1212, 1216, 838 F. Supp. 608, 612 (1993) ("As a

matter of policy in drawback cases, [Commerce] does not require

exporters to account for a sufficient amount of imported product

to cover all products sold to third countries, as well as to the

United States.").  Thus, the statute and the two-prong test put

the emphasis on proof of a direct link between the rebate of the

import duty and on evidence of sufficient imports to account for

the duty drawback and the exports of subject merchandise.  The

court, therefore, agrees with defendant that "[t]here is no legal

basis for the argument that Commerce should not make a duty

drawback adjustment unless it can allocate the total pool of duty

drawback on a proportional basis among all countries to which

respondents export the subject merchandise."  Def.'s Resp. 24;[18]

_____

[18]     The court notes that Commerce has sought public comment
on the two-prong test.  *See* Duty Drawback Practice in Antidumping
Proceedings, 70 Fed. Reg. 37,764 (Dep't of Commerce June 30,
2005) (request for comments).  Plaintiff claims that "[i]f
Commerce's practice might very well change, Mittal should get the
benefit now, not just in future reviews."  Pl.'s Mem. 48.  As
                                                  (continued...)

*see also Pesquera Mares Australes Ltda. v. United States*, 266
F.3d 1372, 1382 (Fed. Cir. 2001) ("[S]tatutory interpretations
articulated by Commerce during its antidumping proceedings are
entitled to deference under *Chevron*.").

In addition, the court finds that the Department supported
with substantial evidence its decision to make an upward
adjustment to CEP to account for the drawback respondents
received from the Korean government on their imports of raw
materials.  Commerce verified that respondents received drawback
for their imports of raw materials used to produce the subject
merchandise and that the amount of raw materials imported covered
the amount of the drawback.  *See* Issues & Decs. Mem. at 13.  In
other words, the Department reasonably concluded that respondents
satisfied the two-prong test and, thus, were entitled
to the CEP adjustment.

Based on the foregoing, the court sustains as supported by
substantial evidence and otherwise in accordance with law
Commerce's duty drawback adjustment to respondents' U.S. price of
CORE.

---

[18](...continued)
yet, however, Commerce has not altered its treatment of duty
drawback adjustments.  Thus, "Commerce's potential rulemaking has
no effect here."  *Rhone-Poulenc, Inc. v. United States*, 20 CIT
573, 584 n.5, 927 F. Supp. 451, 461 n.5 (1996).

V.    Section 201 Safeguard Duties

    Plaintiff next insists that Commerce erred by declining to deduct from CEP certain duties imposed on imports of steel into the United States pursuant to Section 201 of the Trade Act of 1974, 19 U.S.C. § 2251 ("Section 201 Duties").

    In the Final Results, Commerce determined that the Section 201 Duties were not deductible from CEP under 19 U.S.C. § 1677a(c)(2)(A).  Pursuant to that provision, when calculating dumping margins, Commerce reduces U.S. price by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, *and United States import duties*, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States . . . ."  19 U.S.C. § 1677a(c)(2)(A) (emphasis added).  Based on its interpretation of the phrase "United States import duties," Commerce customarily deducts from CEP "normal customs duties"[19] but does not deduct either unfair trade duties or Section 201 Duties.

    With respect to Section 201, that provision "permit[s] the President of the United States to impose safeguard measures in

---

    [19]    Commerce apparently understands the phrase "normal customs duties" to include, *inter alia*, import duties as set out in the Harmonized Tariff Schedule of the United States and the Harbor Maintenance Tax.  In other words, Commerce deducts from CEP those permanent, generally applicable duties fixed at the time of importation.

reaction to threats posed to domestic industry by identified

imported items." *Wheatland Tube Co.*, 30 CIT at __, 414 F. Supp.

2d at 1272 n.1.  For example, the President "may, for purposes of

taking action under [19 U.S.C. § 2253(a)(1)] . . . proclaim an

increase in, or the imposition of, any duty on the imported

article . . . ."  19 U.S.C. § 2253(a)(3).  The President may take

action, however, only "[i]f the United States International Trade

Commission [("ITC" or "Commission")] determines under [19 U.S.C.

§ 2252(b)] that an article is being imported into the United

States in such increased quantities as to be a substantial cause

of serious injury, or the threat thereof, to the domestic

industry . . . ."  19 U.S.C. § 2251(a).  Thus, the President may

not act unilaterally to increase duties on imports.  Rather,

there must first be an affirmative serious injury, or threat of

serious injury finding from the ITC.

     At issue here is the 2002 Presidential Proclamation that

imposed duties to counteract a surge in steel imports.  On

December 19, 2001, pursuant to 19 U.S.C. § 2252, the Commission

submitted to the President its affirmative determination that

certain steel products were "being imported into the United

States in such increased quantities as to be a substantial cause

of serious injury, or threat of serious injury, to the domestic

industries producing like or directly competitive articles."

Presidential Proclamation 7529 To Facilitate Positive Adjustment

to Competition From Imports of Certain Steel Products

("Proclamation 7529"), 67 Fed. Reg. 10,553 (Mar. 5, 2002).  As a

result, on March 5, 2002, the President, pursuant to 19 U.S.C.

§ 2253(a)(3)(A), imposed a duty of 15 percent *ad valorem* on,

among other things, imports into the United States of cold-rolled

steel "for a period of 3 years plus 1 day . . . ."  Proclamation

7529, 67 Fed. Reg. at 10,555.  This Section 201 Duty applied to

the CORE imports into the United States that were the subject of

the instant review.  Upon entering their merchandise, respondents

paid to U.S. Customs and Border Protection ("Customs") the

Section 201 Duty.  There is no dispute over the amount of the

duty charged, nor is there any complaint that respondents failed

to pay the duty owed.

Here, as in the past, the Department concluded it would not

deduct Section 201 Duties from CEP

> because 201 duties are not "United States
> import duties" within the meaning of the
> statute, and to make such a deduction
> effectively would collect the 201 duties a
> second time.  Our examination of the
> safeguard[] and antidumping statutes, and
> their legislative histories indicates that
> Congress plainly considered the two remedies
> to be complementary and, to some extent,
> interchangeable.  Accordingly, to the extent
> that 201 duties may reduce dumping margins,
> this is not a distortion of any margin to be
> eliminated, but a legitimate reduction in the
> level of dumping.

Issues & Decs. Mem. at 15.

Mittal insists that Commerce acted unreasonably in not deducting the Section 201 Duties from U.S. price.  Plaintiff's principal argument is that Section 201 Duties are closer to being normal customs duties than they are to antidumping duties and thus constitute "United States import duties," which must be deducted from CEP.  *See* Pl.'s First Supplemental Br. 3.  While plaintiff does not dispute Commerce's practice of not deducting antidumping and countervailing duties from U.S. price under 19 U.S.C. § 1677a(c)(2)(A), it maintains that Section 201 Duties are not of the same nature as those duties.  In plaintiff's view, Section 201 Duties are more akin to normal customs duties because they share a common purpose, i.e., "both types of duties are protective in nature."  Pl.'s Supplemental Br. 3.

Since the completion of briefing in this case, the Federal Circuit has considered the appeal of this Court's decision in *Wheatland Tube Co.*, which held that Section 201 Duties must be deducted from United States price when calculating a respondent's dumping margin under 19 U.S.C. § 1677a(c)(2)(A).  *Wheatland Tube Co.*, 30 CIT at __, 414 F. Supp. 2d at 1285-86.  In reversing *Wheatland Tube Co.*, the Federal Circuit made two related findings.  First, it found that the Department's "interpretation that 'United States import duties' do not include § 201 safeguard duties was the result of its formal notice-and-comment rulemaking process," and thus that Commerce's interpretation "is entitled to

Consol. Court No. 05-00308                                    Page   42

deference as required by . . . [*Chevron U.S.A. Inc. v. Natural*

*Resources Defense Council, Inc.*, 467 U.S. 837 (1984)] if its

interpretation is reasonable." *Wheatland Tube Co. v. United*

*States*, Nos. 2006-1524, 2006-1525, 2007 WL 2119824, at *4 (Fed.

Cir. July 25, 2007).  Second, it concluded that,

> [i]n light of the legislative history of the
> Antidumping Duty Act of 1921, the
> similarities between antidumping duties and
> § 201 safeguard duties, and the likelihood
> that deducting § 201 safeguard duties from
> the [United States price] would result in
> collecting a double remedy, we hold that
> Commerce's interpretation that "United States
> import duties" does not include § 201
> safeguard duties for the purposes of
> determining the [United States price] and
> calculating the dumping margin is reasonable.

*Wheatland Tube Co.*, 2007 WL 2119824, at *7.  Thus, based on the

Federal Circuit's holding in *Wheatland Tube Co.*, the court

sustains as reasonable Commerce's interpretation of "United

States import duties" to exclude Section 201 Duties and its

decision to not deduct those duties from United States price.


CONCLUSION

    Based on the foregoing, the court sustains Commerce's Final

Results.  Judgment shall be entered accordingly.


                                        /s/ Richard K. Eaton
                                        Richard K. Eaton


Dated:    August 1, 2007
          New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

```
                                    :
MITTAL STEEL USA, INC.              :
(formerly INTERNATIONAL             :
STEEL GROUP, INC.),                 :
                                    :
          Plaintiff,                :
                                    :
     v.                             :
                                    :
UNITED STATES,                      :  Before: Richard K. Eaton, Judge
                                    :
          Defendant,                :  Consol. Court No. 05-00308
                                    :  Public Version
     and                            :
                                    :
UNION STEEL MANUFACTURING           :
CO., LTD.; DONGBU STEEL CO.,        :
LTD.; POSCO; and HYUNDAI            :
HYSCO CO., LTD.,                    :
                                    :
          Deft.-Ints.               :
                                    :
```

JUDGMENT

This case having been submitted for decision and the Court, after deliberation, having rendered a decision therein; now, in conformity with that decision, it is hereby

ORDERED that the United States Department of Commerce's final results of the tenth administrative review of the antidumping duty order applicable to imports into the United States of CORE from the Republic of Korea are sustained; and it is further

ORDERED that this case is dismissed.

                                    /s/ Richard K. Eaton
                                    Richard K. Eaton

Dated:    August 1, 2007
          New York, New York

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____          By: _____
Deputy Clerk